1

2

3

4                    UNITED STATES DISTRICT COURT

5                        DISTRICT OF NEVADA

6  DONALD BOWMAN,                        3:14-cv-00514-MMD-WGC

7                            Plaintiff,  **REPORT & RECOMMENDATION OF**
                                         **U.S. MAGISTRATE JUDGE**
8        v.

9  CAROLYN W. COLVIN,
   Acting Commissioner of
10  Social Security Administration,

11                            Defendant.

12

13          This Report and Recommendation is made to the Honorable Miranda M. Du, United

14  States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

15  28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is Plaintiff

16  Diana L. Sayers' Motion for Reversal and/or Remand. (ECF No. 12.)[1] The Commissioner filed a

17  Cross-Motion to Affirm and Opposition to Plaintiff's motion. (ECF Nos. 17/18.)[2] Plaintiff filed a

18  reply in support of his motion (ECF No. 19) and response to the Commissioner's cross-motion

19  (ECF No. 20).[3]

20          After a thorough review, the court recommends that Plaintiff's motion be granted and the

21  matter be remanded to the ALJ consistent with this Report and Recommendation. In addition, it

22  is recommended that the Commissioner's cross-motion to affirm be denied.

23                              **I. BACKGROUND**

24          Plaintiff filed an application for Supplemental Security Income (SSI) on April 19, 2011,

25  alleging a disability onset date of January 1, 2009. (Administrative Record (AR) 165-170.) The

26  _____

27      [1] Refers to the court's Electronic Case Filing number.

        [2] These documents are identical.

28      [3] ECF Nos. 19 and 20 are also identical.

1    application was denied initially and on reconsideration. (AR 99-102, 106-108.) Plaintiff

2    requested a hearing before an Administrative Law Judge (ALJ). (AR 109-110.) On November 6,

3    2012, Plaintiff appeared, represented by counsel, for the hearing. (AR 69-96.) Plaintiff testified

4    on his own behalf. (AR 73-92.) The ALJ also took testimony from a vocational expert (VE).

5    (AR 92-96.) On November 16, 2012, the ALJ issued a decision finding Plaintiff not disabled.

6    (AR 17-33.) Plaintiff appealed and the Appeals Council denied review. (AR 1-7.) Thus, the

7    ALJ's decision became the final decision of the Commissioner.

8           Plaintiff now appeals the decision to the district court. (ECF No. 12.) First, Plaintiff

9    argues that the ALJ erred in assigning the medical opinions of Dr. Steven Gerson, Dr. Julius

10   Villaflor and APN Kimberly M. Morris "great weight," but then ignored their opinions regarding

11   Plaintiff's ability to stand and/or walk. (ECF No. 12 at 19-23.) Second, Plaintiff similarly argues

12   that the ALJ erred in failing to provide a function-by-function assessment in determining

13   Plaintiff's residual functional capacity when the ALJ did not make any explicit findings on the

14   standing or walking limitations, contrary to Social Security Ruling (SSR) 96-8p. (AR 23-24.)

15   Third, Plaintiff contends that substantial evidence does not support the ALJ's finding that

16   Plaintiff was capable of light work, which requires standing or walking, off and on, for a total of

17   approximately six hours of an eight-hour work day, because it is contradicted by the medical

18   opinion evidence in the record. (*Id*. at 24-25.) Finally, Plaintiff asserts that the ALJ found

19   Plaintiff's testimony not credible, but failed to cite clear and convincing reasons to support this

20   conclusion. (*Id*. at 25-29.)

21          In her response and cross-motion, first, the Commissioner acknowledges that the ALJ did

22   not specifically state that she rejected the State agency physicians' standing and walking

23   limitations, but argues that the ALJ expressly referred to them, showing that she considered

24   them, and set forth specific and legitimate reasons for rejecting them. (ECF Nos. 17/18 at 4-5.) In

25   addition, the Commissioner asserts that the medical evidence from Plaintiff's treating physicians

26   showed that his physical impairments were well managed and controlled with medication. (*Id*. at

27   5.) With respect to APN Morris, the Commissioner argues that she opined Plaintiff could stand

28   for a total of 4 hours and walk for a total of four hours, for a combined walking/standing

1    capability of eight hours, which is consistent with the ALJ's finding Plaintiff could perform light

2    work. (*Id.* at 6.) Even if the ALJ rejected APN Morrison's findings relative to Plaintiff's ability

3    to stand and walk, the Commissioner states that APN Morris is not an acceptable medical source;

4    therefore, the ALJ need only provide germane reasons for rejecting her opinions which the

5    Commissioner maintains she did. (*Id.*) Second, the Commissioner acknowledges that SSR 96-8p

6    provides that a residual functional capacity assessment should expressly state how many hours a

7    claimant can stand and/or walk cumulatively over an eight-hour workday, but the ALJ stated

8    Plaintiff could perform light work as defined in 20 C.F.R. § 416.967(b) and SSR 83-10. (*Id.* at

9    7.) Third, the Commissioner contends the ALJ's decision was based on substantial evidence in

10   the record as it was based on the record as a whole, including Plaintiff's treating records which

11   showed substantial improvement. (*Id.* at 7-8.) Finally, the Commissioner argues that the ALJ's

12   credibility finding is free of legal error. (*Id.* at 8-9.) The Commissioner points out that the ALJ

13   summarized Plaintiff's testimony and then detailed the medical evidence from Plaintiff's treating

14   providers which showed that his impairments were well controlled with medication, and that

15   Plaintiff had a history of medication noncompliance, which detracted from his credibility. (*Id.*)

16                                  **II. STANDARD OF REVIEW**

17           The court must affirm the ALJ's determination if it is based on proper legal standards and

18   the findings are supported by substantial evidence in the record. *Gutierrez v. Comm'r Soc. Sec.*

19   *Admin.*, 740 F.3d 519, 522 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)). "Substantial evidence is

20   'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

21   reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez*, 740 F.3d at 523-

22   24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

23           To determine whether substantial evidence exists, the court must look at the record as a

24   whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*,

25   740 F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may

26   not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*,

27   759F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035

28

(9th Cir. 2007)). "'The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez*, 740 F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)). That being said, "a decision supported by substantial evidence will still be set aside if the ALJ did not apply proper legal standards." *Id.* (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). In addition, the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

### III. DISCUSSION

**A. Five-Step Sequential Process**

Under the Social Security Act, "disability" is the inability to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(b).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. 20 C.F.R. § 404.1520 and § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If at any step the Social Security Administration (SSA) can make a finding of disability or nondisability, a determination will be made and the SSA will not further review the claim. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4); *see also Barnhart v. Thomas*, 540

1   U.S. 20, 24 (2003). "'The burden of proof is on the claimant at steps one through four, but shifts

2   to the Commissioner at step five.'" *Garrison*, 759 F.3d at 1011 (quoting *Bray v. Comm'r of Soc.*

3   *Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009)).

4        In the first step, the Commissioner determines whether the claimant is engaged in

5   "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied.

6   20 C.F.R. § 404.1520(a)(4)(i), (b); § 416.920(a)(4)(i); *Yuckert*, 482 U.S. at 140. If the claimant

7   is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

8        The second step requires the Commissioner to determine whether the claimant's

9   impairment or a combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and

10  § 416.920(a)(4)(ii); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits

11  the claimant's physical or mental ability to do basic work activities. *Id*. Basic work activities are

12  "the abilities and aptitudes necessary to do most jobs[,]" which include:

13       (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling,
         reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking;
14       (3) Understanding, carrying out, and remembering simple instructions; (4) Use of
         judgment; (5) Responding appropriately to supervision, co-workers and usual
15       work situations; and (6) Dealing with changes in a routine work setting.

16  20 C.F.R. § 404.1521 and § 416.921. If a claimant's impairment is so slight that it causes no

17  more than minimal functional limitations, the Commissioner will find that the claimant is not

18  disabled. 20 C.F.R.§ 404.1520(a)(4)(ii), (c) and 416.920(a)(ii). If, however, the Commissioner

19  finds that the claimant's impairment is severe, the Commissioner proceeds to step three. *Id.*

20       In the third step, the Commissioner looks at a number of specific impairments listed in

21  20 C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the

22  impairment meets or is the equivalent of one of the Listed Impairments. 20 C.F.R.

23  § 404.1520(a)(4)(iii), (d) and § 416.920(a)(4)(iii), (c). The Commissioner presumes the Listed

24  Impairments are severe enough to preclude any gainful activity, regardless of age, education, or

25  work experience. 20 C.F.R. § 404.1525(a). If the claimant's impairment meets or equals one of

26  the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed

27  disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d), § 416.920(d). If the claimant's impairment is

28

1    severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to

2    step four. *Yuckert*, 482 U.S. at 141.

3           At step four, the Commissioner determines whether the claimant can still perform "past

4    relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past

5    relevant work is that which a claimant performed in the last fifteen years, which lasted long

6    enough for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R.

7    § 404.1565(a) and § 416.920(b)(1).

8           In making this determination, the Commissioner assesses the claimant's residual

9    functional capacity (RFC) and the physical and mental demands of the work previously

10   performed. *See id.;* 20 C.F.R. § 404.1520(a)(4); *see also Berry v. Astrue*, 622 F.3d 1228, 1231

11   (9th Cir. 2010). RFC is what the claimant can still do despite his or her limitations. 20 C.F.R.

12   § 1545 and § 416.945. In determining RFC, the Commissioner must assess all evidence,

13   including the claimant's and others' descriptions of limitation, and medical reports, to determine

14   what capacity the claimant has for work despite the impairments. 20 C.F.R. § 404.1545(a) and

15   § 416.945(a)(3).

16          A claimant can return to previous work if he or she can perform the "actual functional

17   demands and job duties of a particular past relevant job" or "[t]he functional demands and job

18   duties of the [past] occupation as generally required by employers throughout the national

19   economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and

20   citation omitted).

21          If the claimant can still do past relevant work, then he or she is not disabled for purposes

22   of the Act. 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131 ("Generally,

23   a claimant who is physically and mentally capable of performing past relevant work is not

24   disabled, whether or not he could actually obtain employment.").

25          If, however, the claimant cannot perform past relevant work, the burden shifts to the

26   Commissioner to establish at step five that the claimant can perform work available in the

27   national economy. 20 C.F.R. § 404.1520(e) and § 416.290(e); *see also Yuckert*, 482 U.S. at 141-

28   42, 144. This means "work which exists in significant numbers either in the region where such

individual lives or in several regions of the country." *Gutierrez*, 740 F.3d at 528. If the claimant cannot do the work he or she did in the past, the Commissioner must consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do other work. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the testimony of a vocational expert or by reference to the Grids. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).[4]

If at step five the Commissioner establishes that the claimant can do other work which exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566. Conversely, if the Commissioner determines the claimant unable to adjust to any other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(g); *see also Lockwood*, 616 F.3d at 1071; *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).

**B. Summary of Evidence in the Record**

**1. Medical Evidence**

Plaintiff saw Dr. Lane at Sierra Nevada Cardiology Associates on January 29, 2009, reporting a diagnosis of atrial fibrillation. (AR 319.) He had presented to the emergency room that day with nausea and vomiting, and was in rapid atrial fibrillation. (AR 319.) Dr. Lane recommended a daily baby aspirin. (AR 319.)

Plaintiff was admitted to Carson Tahoe Regional Medical Center on February 26, 2009, with a history of swollen feet and ankles and a recent history of cardiac arrhythmia, and testing which identified him as hyperthyroid. (AR 280-82.) He reported some shortness of breath, significant intestinal symptoms. (AR 280.) He was assessed with: hyperthyroidism, atrial fibrillation, childhood asthma and peripheral edema with questionable cardiac etiology.

---

[4] "The grids are matrices of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Lockwood v. Comm'r of Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010) (internal quotation marks and citation omitted). The Grids place jobs into categories by their physical-exertional requirements, and there are three separate tables, one for each category: sedentary work, light work, and medium work. 20 C.F.R. Part 404, Subpart P, Appx. 2, § 200.00. The Grids take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels. *Id.* Each grid has various combinations of factors relevant to a claimant's ability to find work, including the claimant's age, education and work experience. *Id.* For each combination of factors, the Grids direct a finding of disabled or not disabled based on the number of jobs in the national economy in that category. *Id.*

1   (AR 280.) He was given anti-thyroid medications, Propranolol, and a thyroid scan and T3 scan

2   were ordered. (AR 280.) It was recommended that he follow up with an endocrinologist. (AR

3   282.)

4          Plaintiff was briefly hospitalized on February 27, 2009, for atrial fibrillation, and it was

5   noted he had significant hyperthyroidism. (AR 318.) An echocardiogram showed a moderate

6   cardiomyopathy and severe mitral regurgitation. (AR 318.) Dr. Baker suspected the

7   cardiomyopathy was tachyarrhythmia induced. (AR 318.) Rate control and Coumadin were

8   initiated. (AR 318.) He responded well to therapy and was discharged. (AR 318.)

9          Plaintiff saw Dr. Sutton of Carson Tahoe Regional Medical Center on March 2, 2009.

10  (AR 276.) Plaintiff had significant hyperthyroidism. (AR 276.) He was initiated on treatment

11  with beta blocker therapy and an anti-thyroid medication. (AR 276.)

12         Plaintiff was seen at Carson Tahoe Endocrinology on March 10, 2009. (AR 264.) He

13  complained of lightheadedness and tension/flutters in the chest. (AR 264.) It was indicated he

14  had arthritis, thyroid issues and an "autoimmunity" diagnosis. (AR 265.) He was seen there again

15  on April 6, 2009, May 20, 2009, July 27, 2009 and October 22, 2009. (AR 267-72.)

16  Plaintiff saw Carmella Peters, PA-C of Sierra Nevada Cardiology Associates on March 13, 2009.

17  (AR 317.) He was brought in by the Carson Sheriff's Office because of complaints of

18  progressive bilateral lower extremity edema and shortness of breath. (AR 316.) He had

19  previously been in the hospital with atrial fibrillation and hyperthyroidism.  (AR 316.) He

20  reported frequent palpitations, and that he is easily fatigued. (AR 316.) An electrocardiogram

21  revealed atrial fibrillation with rapid ventricular rate. (AR 317.) She reviewed the case with

22  Dr. Challapalli and Dr. Sutton, who suggested that he stay on propranolol at an increased dose,

23  and was given a trial of Ambien to help him sleep. (AR 317.) He was given Coumadin. (AR

24  317.)

25         He saw Carmella Peters on March 19, 2009. (AR 314-15.) She had previously increased

26  his propranolol dose, which resulted in hives. (AR 314.) He did, however, have a slight increase

27  in energy. (AR 314.) He reported feeling "rather well, except for a 20-minute episode of

28  lightheadedness and dizziness." (AR 314.) An electrocardiogram showed atrial fibrillation with a

rapid ventricular response. (AR 314.) He was advised to decrease the propranolol, and discontinue Lisinopril, and was advised to follow up and discussed his diet. (AR 315.) She noted that she encouraged his disability application process "given his current medical conditions." (AR 315.)

Plaintiff saw Dr. Baker of Sierra Nevada Cardiology Associates on March 28, 2009. (AR 336-37.) He denied palpitations but complained of fatigue. (AR 336.) He was assessed with atrial fibrillation, and there was a discussion of his options, including proceeding with cardioversion. (AR 337.) he was also assessed with cardiomyopathy which Dr. Baker suspected was related to the dysrhythmia and hyperthyroidism. (AR 337.)

Plaintiff was seen by Carmella Peters on April 9, 2009. (AR 312-13.) His history of hyperthyroidism and atrial fibrillation were noted. (AR 312.) He was treating with endocrinologist, Dr. Sutton, for his thyroid issues, which had helped to control his symptoms and showed a marked increase in his energy level. (AR 312.) He denied shortness of breath, but had gained weight. (AR 312.) His blood pressure was 110/80. (AR 312.) An electrocardiogram showed atrial flutter, but he had well-controlled ventricular rates. (AR 312-13.) He was described as "doing very well" and was advised to start increasing his exercise gradually. (AR 313.)

Plaintiff saw Dr. Baker of Sierra Nevada Cardiology Associates on May 28, 2009. (AR 310-11.) He was indicated as being stable as far as his thyroid was concerned. (AR 310.) He denied heart palpitations but reported a lot of fatigue. (AR 310.) He was in atrial fibrillation. (AR 311.) He was on Coumadin for anticoagulation, and it was recommended he proceed with cardioversion in a few weeks. (AR 311.)

On June 23, 2009, Dr. O'Leary performed a successful synchronized cardioversion of Plaintiff's atrial fibrillation to sinus rhythm. (AR 309, 320.) He was advised to follow up in one to two weeks. (AR 309, 320.)

On August 25, 2009, Plaintiff saw Dr. Sutton of Carson Tahoe Regional Medical Center, who reported that a test revealed an elevated thyroid level, and recommended treatment with radioactive iodine. (AR 275.)

1    On September 1, 2009, Dr. Sutton diagnosed Plaintiff with hyperthyroidism and

2 administered radioactive iodine-131 for treatment. (AR 274.) His heart rate was mildly

3 increased. (AR 274.)

4    Plaintiff was seen by Dr. Sutton of Sierra Nevada Cardiology Associates on February 3,

5 2010. (AR 307-08, 333-34, 497-98.) He had a history of hyperthyroidism and was there for

6 follow up care. (AR 307.) He reported doing pretty well, with no palpitations or chest pain, but

7 some fatigue with exertion. (AR 307.) His blood pressure was 134/76. (AR 307.) His Coumadin

8 was stopped as he had undergone successful cardioversion back in June. (AR 307.) He was

9 advised to take aspirin instead and follow up. (AR 307.) An echocardiogram was requested.

10 (AR 308.)

11    Plaintiff was seen at Carson Tahoe Regional Medical Center on January 3, 2011.

12 (AR 284-85.) He noted marked swelling of the right testicle over the past days.  He was taking

13 no medications at that time. (AR 284.) His blood pressure was 175/101, with an irregular pulse.

14 (AR 284.) The EKG revealed he was in atrial fibrillation. (AR 284.) An ultrasound showed

15 hydrocele. (AR 285.) He was prescribed methimazole and propranolol, and was advised to

16 follow up. (AR 285.)

17 Plaintiff saw Dr. Baker of Carson Tahoe Cardiology on January 19, 2011. (AR 305-06, 331-32.)

18 He as noted as having a history of cardiomyopathy likely due to thyroid issues and atrial

19 fibrillation, which was affecting him at the time. (AR 305.) He had no chest pain or palpitations

20 or fatigue. (AR 305.) It was noted that he needed a hydrocele corrected surgically. (AR 305.) His

21 blood pressure was 128/88. (AR 305.) He was put back on medication for the atrial fibrillation

22 which had been effective in controlling the rate in the past. (AR 306.) He was also assessed with

23 cardiomyopathy that was stable. (AR 306.)

24    Plaintiff underwent an independent medical evaluation with Dr. Gerson on November 22,

25 2011. (AR 371-78.) His chief complaints were for heart and thyroid disease, with the primary

26 symptom being decreased stamina. (AR 371-72.) He reported only being able to hike a quarter

27 mile, and experienced occasional shortness of breath on exertion and occasional fluttering of the

28 heart and dizziness. (AR 372.) He also complained of major joint paint which had recently

started, and associated joint weakness. (AR 372.) Dr. Gerson assessed him with: (1) atrial fibrillation with a history of heart disease and cardiomyopathy, and records indicating mitral regurgitation; (2) thyroid disease; (3) arthralgias; (4) a history of peptic ulcer disease; and (5) a history of asthma. (AR 375.) He opined: Plaintiff can lift and/or carry twenty-five pounds occasionally and ten pounds frequently; he can stand and/or walk up to four hours in an eight hour workday ("due to records indicating moderate cardiomyopathy"); sit six or more hours in an eight hour workday; occasionally climb ramps or stairs, crouch, squat and craw; frequently balance, stoop, bend, kneel; and never climb ladders of scaffolds; he was limited to frequent fingering and handling of objects; and was restricted from heights; he could occasionally be around moving machinery.  (AR 375-76.)

On November 29, 2011, Dr. Villaflor completed a physical RFC assessment of Plaintiff. (AR 384-391.) He opined Plaintiff could: occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; stand and/or walk at least two hours in an eight hour workday; sit with normal breaks for a total of six hours in an eight hour work day; occasionally climb ramps and stairs, kneel and crawl; frequently balance, stoop and crouch; but never climb ladders, ropes or scaffolds. (AR 385-86.) He should avoid concentrated exposure to extreme temperatures, fumes, odors, dusts, gases, poor ventilation and hazards. (AR 388.) In forming these opinions, Dr. Villaflor reviewed Plaintiff's medical records and Dr. Gerson's report. (AR 391.)

Plaintiff presented to the emergency room on December 27, 2011 with complaints of leg swelling, generalized body aches and shortness of breath, along with several months of testicular swelling. (AR 405.) It was noted that he had a history of cardiomyopathy, hyperthyroidism, atrial fibrillation, and a scrotal mass with a history of noncompliance with medical therapy. (AR 405.) A chest x-ray showed hazy opacities suggesting layered pleural fluid. (AR 406.) An EKG revealed an irregularly irregular rhythm consistent with atrial fibrillation. (AR 406.) He was given medication to slow his heart rate. (AR 406.) It was determined that he should be admitted. (AR 407.)

1    Plaintiff saw Dr. Khuu at Renown Regional Medical Center on December 28, 2011, with
2  complaints of joint pain in the hands, feet and back, and testicular swelling. (AR 397-402.) He
3  reported that immobility and staying in one position for a long time caused the pain to intensify.
4  (AR 397.) He sometimes got relief from taking Aleve or Tylenol. (AR 397.) He also reported
5  relief after a hot bath. (AR 397.) He was advised to be admitted to control his atrial fibrillation
6  and to continue to evaluate his joint pain. (AR 402.) He also saw Dr. Klass, who noted he had
7  cardioversion and had done well until several months prior when he noted an irregular heartbeat,
8  but did not seek medical care due to his financial status. (AR 402.) He had since developed
9  severe pain and swelling of the joints. (AR 402.) He was short of breath. (AR 403.) He was
10  assessed with cardiomegaly, right pleural effusion. (AR 404.) A thyroid scan was recommended,
11  and medications prescribed. (AR 404-05.)

12    Plaintiff was admitted to Renown Regional Medical Center on December 28, 2011, with
13  complaints of severe joint pain for the past three months. (AR 393-97.) He had multiple nodules
14  on his elbows and forearms. (AR 394.) He was given prednisone which seemed to improve his
15  arthritic pain. (AR 394.) He was found to be in atrial fibrillation that day. (AR 393.) He reported
16  having palpitations in the previous six months. (AR 393.) He was given propranolol and was
17  started on Coumadin, and agreed to follow up with his prior Coumadin clinic upon discharge.
18  (AR 393.) He was advised to follow up with the endocrinologist regarding his hyperthyroidism
19  and with rheumatology for a possible rheumatoid arthritis diagnosis, and with cardiology related
20  to his cardiomyopathy. (AR 397.)

21    Plaintiff saw Dr. O'Leary of Carson Tahoe Cardiology on January 17, 2012. (AR 452-
22  454.) It was noted that he had a history of atrial fibrillation, cardiomyopathy, congestive heart
23  failure and hyperthyroidism, and presented with a decline over the prior six months with
24  arthralgias, fatigue, palpitations, dyspnea with minimal exertion, and cold intolerance. (AR 452.)
25  He was prescribed medications and was referred to an endocrinologist for evaluation of his
26  hyperthyroidism. (AR 453.)

27    On January 24, 2012, Dr. Cheney advised Plaintiff to continue his methimazole and
28  referred him to rheumatology for his arthritic symptoms. (AR 462, 476-78.) At the time he

reported that he had become weak. (AR 476.) He was assessed with hyperthyroidism, and there was evidence of mild to moderate proptosis. (AR 477.) She recommended that he continue on methimazole, and stated that he would ultimately need definitive therapy but he was then uninsured and treatment was not economically feasible. (AR 477.) He also reported joint swelling, pain, and morning stiffness. (AR 477.) He had gotten significant relief from prednisone, but was in great pain since that ran out. (AR 477.) She gave him a prescription for prednisone until he could be seen by rheumatology. (AR 477.)

On January 31, 2012, Plaintiff saw Dr. Joe Chavez of Carson Tahoe Cardiology. (AR 491-92.) He was described as a "[v]ery complex case" and it was recommended to try to cardiovert again. (AR 492.) If he received no benefit, mitral valve surgery would be considered. (AR 492.) Plaintiff was restricted from driving. (AR 492.)

Plaintiff was seen in the office of Dr. Steven G. Atcheson of Arthritis Specialists of Northern Nevada, and a report was completed by Kimberly M. Morris, MSN, APN on February 2, 2012. (AR 456-61.) She noted that Plaintiff received radioactive iodine in the past which improved his thyroid function, and responded to the cardioversion. (AR 456.) He reported that he had to shut down his business when these medical issues surfaced because he lost a large amount of lean body tissue and was unable to work. (AR 456.) After receiving treatment, he began to feel better and worked a little bit, but then developed sudden onset swelling in the testicles which turned out to be hydrocele. (AR 456.) He then developed atrial fibrillation again and thyrotoxicosis. (AR 456.) He was taking Coumadin and indicated the plan was to maintain this therapy for several months and try cardioversion again. (AR 456.) He reported that he had developed "full-blown symmetrical monoarticular joint pain" seven to eight months prior, which progressed quickly to "full-blown symmetrical polyarticular arthritis" with severe pain, stiffness, swelling and restriction of range of motion. (AR 456.) He indicated that he could not function for about two hours every morning as a result. (AR 456.) He had difficulty opening and closing his hands and difficulty walking. (AR 457.) He had difficulty sleeping because of the pain. (AR 457.)

1    Examination of the cervical spine revealed significant stiffness and tenderness to minimal

2    manipulation. (AR 459.) His wrists and hands were significantly swollen in the wrists with

3    significant tenderness and decreased hand strength.  (AR 459.) His knees were stiff, and he had

4    great difficulty extending his right leg. (AR 459.) She concluded his symptoms were consistent

5    with rheumatoid arthritis. (AR 460.) She opined that he was completely unable to work at that

6    time. (AR 460.) She doubled his prednisone dose and started him on methotrexate. (AR 460.)

7    Plaintiff saw Dr. Chavez on February 8, 2012, for a cardiology follow up and was advised to

8    continue his medications for atrial fibrillation. (AR 489-90.)

9    APN Morris completed a physical RFC for Plaintiff on March 14, 2012. (AR 480.) She

10   opined Plaintiff could sit, stand and walk continuously without changing positions for two hours

11   in an eight hour workday, and that he could sit, stand and walk cumulatively for four hours over

12   the course of a work day. (AR 480.) She opined he could not be expected to work. (AR 480.)

13   Plaintiff saw Dr. Chavez at Carson Tahoe Cardiology on March 30, 2012. (AR 487-88.) He was

14   assessed with atrial fibrillation, but was described as "doing well" and was advised to continue

15   his medications and follow up in three months. (AR 488.)

16   He was seen for a follow up visit for his arthritis by APN Morris and Dr. Atchcheson on

17   April 18, 2012. (AR 481-82.) He reported significant improvement with the prednisone and

18   methotrexate. (AR 481.) He was starting to get some of his strength back. (AR 481.) The

19   prednisone was to be gradually decreased while the methotrexate was increased, and he was

20   advised to follow up in three months. (AR 481.)

21   On May 11, 2012, Plaintiff called to state that he had gotten worse over the previous two

22   weeks, with stiffness and swelling. (AR 482.)

23   **2. Hearing Testimony**

24   Plaintiff testified at a hearing before the ALJ on November 6, 2012. At the time of the

25   hearing he was thirty-five years old. (AR 73.) He stopped working as of January 1, 2009, and

26   had previous work in construction and in appliance repair. (AR 74.) He stopped working due to

27   his health issues, starting with his heart problems which commenced with a five-day hospital

28   stay resulting in a diagnosis of cardiomyopathy and atrial fibrillation. (AR 75, 82.)

He lives with his parents. (AR 76.) On a normal day, he gets up and has to stretch to get "semi-mobile," and immediately takes a hot bath where he soaks for a half hour before he can move. (AR 76.) He experiences pain on a daily basis due to his arthritis in his feet and ankles. (AR 77.) On a bad day, he cannot stand on his feet. (AR 77.) He likened it to walking on marbles, with a nail shooting into the side of his ankle. (AR 80.) He can walk around for ten to fifteen minutes before he cannot move anymore. (AR 77.) On a good day he could walk through a store, or walk around the block, but then cannot do anything else. (AR 80, 90.) He then has to elevate his feet. (AR 80.) He cannot sit for longer than fifteen minutes at a time. (AR 80.) He also cannot be on his feet standing, and on bad days, he cannot stand at all. (AR 80.) He would need additional breaks in order to elevate his feet. (AR 91.) On a good day, he might be able to sit for an hour straight. (AR 91.) In a week, he might have two or three good days, or he might have none. (AR 91-92.)

Some days he is semi-functional, and there are other days where he cannot pick up a gallon of milk. (AR 77.) He does not drive because he gets lightheaded. (AR 77-78.) He used to engage in hobbies such as hiking and biking, but can no longer do them. (AR 78.) His parents help him with cooking, keeping the house up, getting dressed on occasion, getting into the bathtub. (AR 89.)

His heart condition causes him to lack stamina, he always feels fatigued, and is short of breath. (AR 83, 85.) He continues to experience swelling due to his heart condition as well as his arthritis, and has to elevate his feet when this occurs. (AR 83-84, 87.) His hands swell up two to three times a week, which restricts his ability to do things. (AR 87.) He constantly gets lightheaded when he stands up, and has passed out at times. (AR 84.)

The ALJ then posed various hypotheticals to the VE. In the first hypothetical, the ALJ asked about an individual with Plaintiff's past relevant work, limited to a light level of exertion, with occasional posturals, restrictions on working at heights and climbing, should avoid temperature extremes, should work in a reasonably clean environment, would able to do frequent handling and fingering, and should avoid hazards. (AR 93.) The VE testified that this individual could not perform past relevant work as a construction worker or in appliance repair. (AR 93.)

1    The VE testified that this individual would be able to perform the jobs of cashier II, housekeeper,

2    and packing line worker. (AR 93-94.)

3          Plaintiff's counsel then posed additional questions to the VE. First, she asked if the

4    individual described in the ALJ's hypothetical were limited to standing and/or walking up to two

5    hours in an eight-hour day, whether the individual would still be able to do the jobs identified

6    above. (AR 95.) The VE responded, "no." (AR 95.) That limitation would be consistent with

7    sedentary RFC. (AR 95.) Next, Plaintiff's counsel added the additional limitation of only

8    occasional handling and fingering (in addition to the limitation on standing/walking), and the VE

9    responded that there would be no jobs at the sedentary level with an occasional handling and

10   fingering limitation. (AR 95.) Plaintiff's counsel then asked the VE whether the individual could

11   perform any jobs if the individual described in her hypothetical needed to elevate his feet above

12   his heart, and the VE responded, "[t]here would be no jobs." (AR 95.) Finally, Plaintiff's counsel

13   added a limitation of working two hours in a day, which the VE confirmed would not be full-

14   time work. (AR 95.)

15   **C. ALJ's Findings in this Case**

16          In the present case, the ALJ applied the five-step sequential evaluation process and found

17   at step one that Plaintiff had not engaged in substantial gainful activity since the application date

18   of April 19, 2011. (AR 22.)

19          At step two, the ALJ found it was established Plaintiff suffered from the following severe

20   impairments: hyperthyroidism, cardiomyopathy, atrial fibrillation, rheumatoid arthritis, and

21   hydrocele. (AR 22.)

22          At step three, the ALJ concluded Plaintiff did not have an impairment or combination of

23   impairments that meet or medically equal the severity of one of the Listed Impairments. (AR 22.)

24          At step four, the ALJ found Plaintiff has the RFC to perform light work as defined in

25   20 C.F.R. § 416.967(b), except he would be limited to occasional postural limitations; he could

26   never climb; he could frequently handle and finger; he should work in a reasonably clean

27   environment and avoid temperature extremes and fumes; he should avoid hazards, including

28

1    working at heights and operating dangerous moving machinery. (AR 22.) Importantly, she did

2    not mention Plaintiff's ability or inability to stand or walk during a work day.

3          Based on the VE's testimony, the ALJ concluded that Plaintiff was unable to perform

4    past relevant work as an appliance repairman or construction worker. (AR 26.)

5          At step five, the ALJ considered Plaintiff's age (34 at the time the application was filed),

6    education, work experience and RFC, and concluded that jobs exist in significant numbers in the

7    national economy that Plaintiff is capable of performing, including: Cashier II (DOT 211.462-

8    010); Cleaner (DOT 323.687-014); and Packing-Line Worker (DOT 753.687-038). (AR 26-27.)

9    Each of the jobs identified are classified as unskilled, light work. (AR 27.) As a result, the ALJ

10   found Plaintiff not disabled since his application date of April 19, 2011. (AR 27-28.)

11   **D. The ALJ Erred in Failing to Discuss the Medical Sources' Opinions as to Plaintiff's**

12   **Standing/Walking Limitations and in Failing to Include a Function-by-Function Discussion**

13   **of Plaintiff's Abilities, Including his Ability to Stand/Walk in her RFC Assessment**

14         The ALJ noted that APN Morris, who was working under Plaintiff's treating

15   rheumatologist, Dr. Steven G. Atcheson, completed a medical source statement on Plaintiff's

16   behalf in March 2012. (AR 24-25.) The ALJ indicated that Ms. Morris opined Plaintiff could sit

17   for four hours, stand for four hours, and walk for four hours during an 8-hour workday. (AR 25.)

18   While acknowledging that as an ANP, Ms. Morris is not an acceptable medical source, the ALJ

19   considered her opinion, as restricted to Plaintiff's complaints of rheumatoid arthritis and hand

20   and joint pain, and found it was supported by the medical evidence in the record and accorded it

21   "great weight to the extent her conclusions support the above residual functional capacity for a

22   limited range of light exertional work." (AR 25.) The ALJ did not mention or further discuss

23   Ms. Morris's opinion that Plaintiff could only stand continuously for two hours and walk

24   continuously for two hours without changing position during a work day. (AR 480). Nor did the

25   ALJ discuss Ms. Morris's opinion that Plaintiff was unable to work in light of these limitations.

26   (AR 480.)

27         Next, the ALJ referenced Dr. Gerson's consultative physical examination of Plaintiff in

28   November 2011. (AR 25.) The ALJ noted Dr. Gerson's opinion that Plaintiff could, *inter alia*,

stand and or walk four hours in an eight hour workday due to cardiomyopathy and sit for six

hours in an eight-hour workday. (AR 25.) The ALJ also mentioned the State agency medical

consultant's (Dr. Villaflor) opinions, noting that he generally adopted Dr. Gerson's limitations,

but the ALJ did not specifically mention any limitations as to standing or walking. (AR 25-26.)

In fact, Dr. Villaflor had opined that Plaintiff could stand and/or walk at least two hours in an

eight-hour work day, and sit for six hours in an eight-hour work day. (AR 385.) The ALJ stated

that she found Dr. Gerson's and Dr. Villaflor's opinions to be supported by the medical evidence

in the record and accorded them "great weight to the extent their conclusions support the above

residual functional capacity for a limited range of light work with occasional postural limitations

and never climbing." (AR 26.)

     While the ALJ accorded these opinions "great weight," she did not set forth any reason

for rejecting their opinions relative to Plaintiff's inability or ability to stand or walk during the

work day. The court finds the ALJ erred in this regard.

     Light work is defined as, *inter alia*, "requir[ing] *a good deal of walking or standing*, or ...

sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §

416.967(b) (emphasis added). "To be considered capable of performing a full range of light

work, [the claimant] must have the ability to do *substantially all of these activities*." *Id.*

(emphasis added). Social Security Ruling 83-10 expands on this by providing, "the full range of

light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-

hour workday. Sitting may occur intermittently during the remaining time." SSR 83-10, 1983

WL 31251 (1983). Since a claimant must be able to perform the standing and walking

requirements of the job for 6 out of 8 hours in a workday, the ALJ's failure to discuss Plaintiff's

abilities in this regard, and failure to reject the medical source opinions on this topic was in error.

     The agency "will always consider the medical opinions in your case record together with

the rest of the relevant evidence" received, and "[r]egardless of its source, we will evaluate every

medical opinion we receive." 20 C.F.R. § 404.1527(b), (c); *see also Tommasetti v. Astrue,* 533

F.3d 1035, 1041 (9th Cir. 2008) ("The ALJ must consider all medical opinion evidence."). The

Ninth Circuit has explicitly held that "[w]here an ALJ does not explicitly reject a medical

1    opinion or set forth specific, legitimate reasons for crediting one medical opinion over another,

2    he errs." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citing *Nguyen v. Chater*, 100

3    F.3d 1462, 1464 (9th Cir. 1996)).

4         "In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight

5    while doing nothing more than ignoring it, asserting without explanation that another medical

6    opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a

7    substantive basis for his conclusion." *Id*. This was most recently confirmed by the Ninth Circuit

8    in *Marsh v. Colvin,* where the court held that the ALJ erred when he did not even mention the

9    treatment notes and assessment of one of the claimant's treating physicians, let alone give

10   specific and legitimate reasons supported by substantial evidence for rejecting the opinion.

11   *Marsh v. Colvin*, --- F.3d ---, 2015 WL 4153858, at * 1-2 (9th Cir. July 10, 2015).

12        "'In disability benefits cases ... physicians may render medical, clinical opinions, or they

13   may render opinions on the ultimate issue of disability—the claimant's ability to perform work.'"

14   *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d

15   715, 725 (9th Cir. 1998)). Courts "'distinguish among the opinions of three types of physicians:

16   (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the

17   claimant (examining physicians); and (3) those who neither examine nor treat the claimant

18   (nonexamining physicians).'" "'If a treating or examining doctor's opinion is contradicted by

19   another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons

20   that are supported by substantial evidence.'" *Id*. Because a court must give 'specific and

21   legitimate reasons' for rejecting a treating [or examining] doctor's opinions, it follows even more

22   strongly that an ALJ cannot in its decision totally ignore a treating [or examining] doctor and his

23   or her notes, without even mentioning them." *Marsh*, 2015 WL 4153858, at * 2 (citing *Garrison*,

24   759 F.3d at 1012).

25        Here, because the ALJ did not mention the medical source opinions regarding Plaintiff's

26   ability to stand or walk during the workday, let alone provide specific and legitimate reasons for

27   rejecting their opinions that Plaintiff could not perform the requirements of light work−the

28   ability to walk or stand for 6 hours−she erred. *See Marsh*, 2015 WL 4153858, at * 2.

1

2          In addition, Plaintiff is correct that an ALJ is directed to assess a claimant's "work-

3  related abilities on a function-by-function basis, including the functions in paragraphs (b), (c),

4  and (d) of 20 C.F.R. 404.1545 and 416.945. Only after that may RFC be expressed in terms of

5  the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8P,

6  1996 WL 374184 (July 2, 1996). "[I]n order for an individual to do a full range of work at a

7  given exertional level, such as sedentary, the individual must be able to perform substantially all

8  of the exertional and nonexertional functions required in work at that level." *Id*. "Therefore, it is

9  necessary to assess the individual's capacity to perform each of these functions in order to decide

10 which exertional level is appropriate and whether the individual is capable of doing the full range

11 of work contemplated by the exertional level." *Id*. SSR 96-8P cautions that at step four, "a failure

12 to first make a function-by-function assessment of the individual's limitations or restrictions

13 could result in the adjudicator overlooking some of an individual's limitations or restrictions."

14 *Id*. Similarly, it states with respect to step five:

15            Without careful consideration of an individual's functional capacities to support
             an RFC assessment based on an exertional category, the adjudicator may either
16           overlook limitations or restrictions that would narrow the ranges and types of
             work an individual may be able to do, or find that the individual has limitations or
17           restrictions that he or she does not actually have.

18 *Id*. SSR 96-8P makes clear that an ALJ is required to address the claimant's exertional and non-

19 exertional abilities in determining the RFC. The exertional abilities specifically include the

20 claimant's ability to sit, stand and walk, and the ALJ must consider each function separately,

21 "even if the final RFC assessment will combine activities." *Id*. Finally, SSR 96-8P provides:

22 "The RFC assessment must always consider and address medical source opinions. If the RFC

23 assessment conflicts with an opinion from a medical source, the adjudicator must explain why

24 the opinion was not adopted." *Id*.

25          Because the ALJ did not specifically discuss Plaintiff's ability to stand and walk in her

26 RFC assessment, and failed to discuss the medical source opinions limiting Plaintiff's ability to

27 stand and walk and explain why she rejected those opinions, the ALJ erred.

28

- 20 -

1      "ALJ errors in social security cases are harmless if they are 'inconsequential to the

2   ultimate nondisability determination' and ... 'a reviewing court cannot consider [an] error

3   harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the

4   testimony, could have reached a different disability determination.'" *Marsh*, 2015 WL 4153858,

5   at * 3.

6      The court cannot conclude that the ALJ's error was harmless. During the examination of

7   the VE, Plaintiff's attorney posed an additional hypothetical where the individual was limited to

8   standing and/or walking for two hours in a workday, and the VE testified that the individual

9   would not be able to perform the jobs identified by the ALJ as existing in significant numbers in

10   the national economy. (AR 95.) This individual's ability would be consistent with a sedentary

11   RFC. (*Id.*) If Dr. Villaflor's opinion were credited as true, Plaintiff could not perform the work

12   identified by the VE and the ALJ. It is not clear, however, whether Plaintiff could perform any

13   other sedentary level jobs in the national economy.

14      Therefore, the matter should be reversed and remanded to the ALJ for consideration of

15   the medical sources' opinions on Plaintiff's ability to stand and/or walk during a workday and

16   for the ALJ to provide an appropriate function-by-function discussion of Plaintiff's exertional

17   and non-exertional abilities in the RFC assessment. It is not clear from the record whether

18   Plaintiff could form any other jobs available in significant numbers in the national economy,

19   such as those classified as sedentary work, and as a result, the matter should not be remanded

20   simply for the payment of benefits.

21   **E. The ALJ Erred in Assessing Plaintiff's Credibility**

22      **1. Standard**

23      "[A] claimant's credibility becomes important at the stage where the ALJ is assessing

24   residual functional capacity, because the claimant's subjective statements may tell of greater

25   limitations than can medical evidence alone." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th

26   Cir.  2001) (citing SSR 96-7p (1996)).  Thus, a claimant's credibility is often crucial to a finding

27   of disability.  The ALJ is responsible for determining credibility.  *Meanel v. Apfel*, 172 F.3d

28

1   1111, 1113 (9th Cir.  1999); *Magallanes*, 881 F.2d at 750; *see also Lingenfelter v. Astrue*, 504

2   F.3d 1028, 1035-36 (9th Cir.  2007).

3        In general, when deciding to accept or reject a claimant's subjective symptom testimony,

4   an ALJ must engage in two steps: an analysis under *Cotton v. Bowen*, 799 F.2d 1403 (9th Cir.

5   1986) (the "*Cotton* test"), and an analysis of the credibility of the claimant's testimony regarding

6   the severity of his or her symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir.  1996);

7   *see also* 20 C.F.R. § 404.1529 (adopting two-part test).

8        First, under the *Cotton* test, a claimant who alleges disability based on subjective

9   symptoms "must produce objective evidence of an underlying impairment 'which could

10  reasonably be expected to produce pain or other symptoms alleged.'" *Bunnell v. Sullivan*, 947

11  F.2d 341, 344 (9th Cir.  1991) (en banc) (citing 42 U.S.C. § 423(d)(5)(A)); *see also  Berry v.

12  Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010)*; Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th

13  Cir. 2007). The test "imposes only two requirements on the claimant: (1) [he or] she must

14  produce objective medical evidence of an impairment or impairments; and (2) [he or] she must

15  show that the impairment or combination of impairments *could reasonably be expected to* (not

16  that it did in fact) produce some degree of symptom." *Smolen*, 80 F.3d at 1282 (emphasis

17  original); *see also* 20 C.F.R. § 404.1529(a)-(b).

18        "Second, if the claimant meets the first test, and there is no evidence of malingering, the

19  ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

20  specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036 (internal

21  quotation marks and citation omitted); *see also Valentine v. Comm'r of Soc.  Sec. Admin.*, 574

22  F.3d 685, 693 (9th Cir.  2009). "This is not an easy requirement to meet: 'The clear and

23  convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759

24  F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

25        An ALJ's credibility findings are entitled to deference if they are supported by substantial

26  evidence and are "sufficiently specific to allow a reviewing court to conclude the adjudicator

27  rejected the claimant's testimony on permissible grounds and did not 'arbitrarily discredit a

28  claimant's [symptom] testimony.'" *Bunnell,* 947 F.2d at 345 (quoting *Elam v. Railroad*

1    *Retirement Bd.*, 921 F.2d 1210, 1215 (11th Cir. 1991)). "General findings are insufficient; rather,

2    the ALJ must identify what testimony is not credible and what evidence undermines the

3    claimant's complaints." *Berry*, 622 F.3d at 1234 (internal quotation marks and citation omitted).

4           An ALJ may consider various factors in assessing the credibility of the allegedly

5    disabling subjective symptoms, including: daily activities; the location, duration, frequency, and

6    intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage,

7    effectiveness, and side effects of any medication taken to alleviate symptoms; treatment, other

8    than medication, received for relief of symptoms; any measures a claimant has used to relieve

9    symptoms; and other factors concerning functional limitations and restrictions due to symptoms.

10   20 C.F.R. § 404.1529(c)(3)(i)-(vii).

11          When analyzing credibility, an ALJ may properly consider medical evidence in the

12   analysis; however, the ALJ may not reject subjective pain testimony "on the sole ground that it is

13   not fully corroborated by objective medical evidence[.]" *Rollins v. Massanari*, 261 F.3d 853, 857

14   (9th Cir. 2001); *see also Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1196 (9th Cir. 2004)

15   (holding ALJ properly determined credibility where claimant's testimony was contradictory to

16   and unsupported by objective medical evidence).

17          **2. Analysis**

18          At step four, the ALJ gave a summary of Plaintiff's testimony. (AR 23.) The ALJ then

19   stated:

20          After careful consideration of the evidence, I find that the claimant's medically
            determinable impairments could reasonably be expected to cause the alleged
21          symptoms; however, the claimant's statements concerning the intensity,
            persistence and limiting effects of these symptoms are not credible to the extent
22          they are inconsistent with the above residual functional capacity assessment.

23   (AR 23.)

24          The ALJ went on to provide a summary of the medical evidence in the record. (AR 23-

25   24.) Other than generally referencing a history of medication noncompliance (AR 26), this

26   summary provides no commentary regarding the ALJ's adverse credibility finding. Moreover, a

27   brief reference to medication noncompliance is not a specific, clear and convincing reason to

28   find Plaintiff less than credible because there is only a brief reference in the medical records to

1  noncompliance, and Plaintiff's medical providers focused more on the fact that Plaintiff was

2  unable to obtain treatment due to his financial and uninsured status.

3       In sum, the ALJ erred in failing to set forth specific, clear and convincing reasons for

4  finding Plaintiff less than credible. Even crediting Plaintiff's testimony, it is not clear from the

5  record whether Plaintiff could perform sedentary work or whether such jobs are available in

6  significant numbers in the national economy. Therefore, the matter should be remanded for

7  further proceedings and not for the payment of benefits.

8       **IV. RECOMMENDATION**

9       **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Remand/Reversal (ECF

10  No. 12) be **GRANTED** and this matter should be **REMANDED** to the ALJ to conduct further

11  proceedings consistent with this Report and Recommendation;

12       **IT IS FURTHER RECOMMENDED** that the Commissioner's Cross-Motion to Affirm

13  (ECF No. 17) be **DENIED**.

14       The parties should be aware of the following:

15       1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local

16  Rules of Practice, specific written objections to this Report and Recommendation within fourteen

17  days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and

18  Recommendation" and should be accompanied by points and authorities for consideration by the

19  District Court.

20       2. That this Report and Recommendation is not an appealable order and that any notice of

21  appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

22  until entry of the District Court's judgment.

23

   DATED: September 2, 2015.

24

25  WILLIAM G. COBB
   UNITED STATES MAGISTRATE JUDGE

26

27

28